**EX PARTE Byrias ROBERSON**

**NO. 02–13–00582–CR**

Court of Appeals of Texas,
Fort Worth.

DELIVERED: January 8, 2015

Rehearing and Rehearing En Banc
Overruled February 19, 2015

Mark Briley, Office of the Public Defender, Wichita Falls, for Appellant.

Maureen Shelton, District Attorney for Wichita County, Wichita Falls, for The State of Texas.

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

## OPINION

ANNE GARDNER, JUSTICE

Appellant Byrias Roberson appeals the denial of his pretrial application for writ of habeas corpus. Appellant contends the State goaded him into moving for a mistrial during his first trial and, therefore, any retrial would violate his protections against double jeopardy. We affirm.

## Background

In appellant's first trial for resisting arrest, the record shows that after the parties made their strikes, the jury was selected, the jury was sworn, the trial court excused the remaining veniremembers, the trial court gave instructions to the six jurors, the State read the indictment, appellant pled not guilty, and the trial court excused the jury despite the fact it was only about 3:00 p.m. and instructed the jurors to return the next morning. The record then resumes with the notation, "(Open court, defendant present, no jury)," and the prosecutor announced that the State's investigator, Donnie Cavinder, had "mistakenly" spoken to one of the jurors. The prosecutor stated that it was Cavinder, not a juror, who brought the matter to her attention. Cavinder was sworn in and testified that he left the courtroom before the jury was seated to run some equipment upstairs and, as he was coming back down, saw a person whom he believed to be Veniremember Fifteen. Cavinder explained that Veniremember Fifteen had already been released, so he decided to talk to her because she had commented during voir dire that she knew of him. Cavinder said the woman then corrected him by saying Veniremember Fifteen was someone else, and then it came up that the woman to whom he was speaking was the one who went to a game warden school. Cavinder said he then saw her badge by her right side and realized she was a juror. Cavinder denied discussing anything about the case. Although given an opportunity to cross-examine Cavinder, appellant declined. Ostensibly because the jurors had been excused, the trial court was not able to speak to the juror in question that day.

When the case resumed the next morning, the trial court questioned Veniremember Eight, who had become the third juror (Juror Number Three). She testified Cavinder just asked about her experience as a game warden. She added she thought Cavinder also made a comment to the effect, "You were struck, but then we got you on." She said she responded indifferently and told him she was going to leave. Juror Number Three continued, "[W]e stopped the conversation right there because he didn't realize that at [that] point I was a juror, a selected juror, I guess." Juror Number Three said she was wearing her juror badge on her purse.

Appellant thereafter moved for a mistrial. Appellant argued that regardless of what was actually said, he was left with no choice but to ask for a mistrial because the problem was that Cavinder said "we" got you on, and Juror Number Three was left with the impression that appellant did not want her on the panel whereas the State did. Appellant further stated, "[W]e're certainly not casting dispersions [sic] on Mr. Cavinder." When granting the mistrial, the trial judge said, "And I'm not casting fault on Investigator Cavinder at all. I understand that was an honest mistake. I completely believe that he believed he was speaking to [Veniremember Fifteen]."

A review of the record shows Veniremember Fifteen had indicated during voir dire that although she didn't know Cavinder, she knew of him. The voir dire also shows Juror Number Three disclosed she went to a game warden academy. The record does not reflect when Cavinder left the courtroom.

Thereafter, appellant filed an application for writ of habeas corpus. Appellant contended the prosecution goaded him into requesting a mistrial. The State filed a bench brief in which it conceded Cavinder's conversation with Juror Number Three was inappropriate but asserted Cavinder's blunder was insufficient under the relevant standard to meet appellant's bur-

den of showing the State intended to provoke him into moving for a mistrial.

At the hearing on appellant's application for writ of habeas corpus, which occurred approximately fifty days after the trial court granted the mistrial, appellant's wife testified that she was present when the previous jury was selected, and she maintained Cavinder did not leave the courtroom until the jurors left the courtroom. Her recollection was the other veniremembers left the courtroom ten to fifteen minutes before the jurors themselves left. She estimated five to ten minutes after the jurors left the courtroom, the prosecutor and Cavinder came back into the courtroom to alert the court about the conversation. Appellant again argued the State intended to goad him into moving for a mistrial. The State again argued Cavinder's conduct was the result of a mistake. The trial court denied appellant's application.

The parties do not dispute jeopardy attached at the first trial. Jeopardy attaches at the time the jury is empaneled and sworn. *State v. Blackshere,* 344 S.W.3d 400, 404 (Tex.Crim.App.2011). The parties also do not dispute the State was responsible for its investigator's actions. The investigative team's knowledge is imputed to the prosecutor. *Ex parte Adams,* 768 S.W.2d 281, 291–92 (Tex.Crim. App.1989).

### Standard of Review

"Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Oregon v. Kennedy,* 456 U.S.

667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982); *Ex parte Bennett,* 245 S.W.3d 616, 618–19 (Tex.App.—Fort Worth 2008, pet. ref'd). "Under both the federal and state constitutions, retrial is barred only if the prosecutor intentionally caused a mistrial." *Bennett,* 245 S.W.3d at 619. When reviewing a trial court's decision to grant or deny habeas relief, appellate courts consider the evidence in the light most favorable to the trial court's ruling and should uphold the ruling absent an abuse of discretion. *Id.* at 618. The Court of Criminal Appeals has set out a nonexclusive list of objective factors to assist the trial court when assessing the prosecutor's or its agent's state of mind: (1) Was the misconduct an attempt to abort a trial that was going badly for the State? Put another way, at the time the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal? (2) Was the misconduct repeated despite the trial court's admonitions? (3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct? (4) Was the conduct "clearly erroneous"? (5) Was there a legally or factually plausible basis for the conduct despite its impropriety? (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional?[1] *See Ex parte Wheeler,* 203 S.W.3d 317, 323–24 (Tex. Crim.App.2006).

### Discussion and Application

To rule in appellant's favor, the trial court would have had to effectively find the evidence showed the following: (1) Cavinder deliberately spoke to Juror Number Three knowing she was a member

---

1. *Wheeler* referred to reckless or intentional misconduct. The Court of Criminal Appeals later limited double jeopardy relief to intentional conduct only. *Ex parte Lewis,* 219 S.W.3d 335, 336–37, 371 (Tex.Crim.App. 2007).

of the jury; (2) Cavinder deliberately told Juror Number Three that appellant tried to have her struck but the State saved her for the purpose of prejudicing Juror Number Three against appellant; (3) rather than hide the improper influence, Cavinder then alerted the prosecutor of his improper conduct knowing the prosecutor would have to bring the matter to the trial court's attention; (4) Cavinder deliberately lied to the trial court about mistaking Juror Number Three for Veniremember Fifteen to mask the fact he was attempting to intentionally cause a mistrial; (5) Cavinder deliberately lied to the trial judge about when he left the courtroom notwithstanding the fact the trial judge, the prosecutor, and defense counsel were all likely present when he left the courtroom and could have easily caught him in the lie; (6) appellant's wife's recollection of Cavinder's presence or absence during voir dire approximately fifty days later was accurate; and (7) Cavinder did all this because it appeared appellant would likely obtain an acquittal. As evidenced by its ruling, the trial court declined to read the facts in this manner. For the reasons that follow, the record supports the trial court's decision to not construe the facts in appellant's favor.

**(1) Was the misconduct an attempt to abort a trial that was going badly for the State? Put another way, at the time the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?**

The trial court granted the mistrial before the State had presented a single witness. Appellant argued the State was trying to avoid an adverse pretrial ruling regarding the admission of extraneous bad acts. Appellant contended the State had not given timely notice for extraneous bad acts and needed the mistrial to delay the trial and thereby comply with the notice requirements. The record confirms appellant had requested notice of extraneous bad acts, and although the State provided a witness list and an amended witness list consisting exclusively of police officers, the State did not specifically respond to appellant's request for notice.

Regarding the adverse ruling, appellant filed a motion in limine regarding any allegations of extraneous bad acts. At the hearing on the motion in limine, the State said it anticipated testimony about the officers' entry into the home, and if appellant intended to challenge the legality of that entry, the State wanted an opportunity to question some of its witnesses about a prior disturbance during which appellant had barricaded himself and his family inside their home. The prosecutor said that testimony would go to the officers' ability to identify and recognize appellant, the officers' state of mind, the reason the gang task force was asked to serve the warrants, and the reason why the officers thought appellant lived in this particular residence. At this point, appellant pointed out to the judge that he had asked for notice of other bad acts and had not received any. The trial court responded by granting Appellant's motion in limine, by instructing the parties to approach him before starting with those witnesses to determine precisely what the officers could and could not go into, and by informing appellant he was inclined to let the officers say they recognized appellant from prior contact with him but that anything more presented a problem that would have to be discussed.

In short, the adverse ruling to which appellant was referring was the granting of his motion in limine. The trial court gave no definitive ruling regarding the admissibility of the extraneous bad acts, although until the facts were further developed, he was inclined to keep them out. Even the prosecutor acknowledged that

the extraneous bad acts became relevant only if appellant challenged the legality of the entry, and, on this record, we do not know if appellant's strategy was to challenge that entry. Appellant was charged with resisting arrest. Tex. Penal Code Ann. § 38.03(a) (West 2011). The unlawfulness of an arrest or search is not a defense to resisting arrest. Tex. Penal Code Ann. § 38.03(b).

On the other hand, appellant may have had a self-defense defense. The use of force to resist an arrest or search is justified if, before the actor offers any resistance, the peace officer uses or attempts to use greater force than necessary to make the arrest or search and, further, to the degree the actor reasonably believed the force was immediately necessary to protect himself from the police officer's use or attempted use of excessive force. Tex. Penal Code Ann. § 9.31(c) (West 2011). Shortly after ruling on the motions in limine, the trial judge made statements anticipating this defense. The prosecutor addressed this defense at length during her voir dire. Appellant did not, but he may have deemed it unnecessary given the prosecutor's voir dire. Without knowing the strength of the State's case or of appellant's defense, the trial court could only speculate on the effect any of his rulings had on the parties. We are not persuaded that by granting appellant's motion in limine and by tentatively ruling to keep out the prior disturbance, the trial court would have been compelled to conclude the State, through its investigator, deliberately engaged in a strategy of brinkmanship and perjury to avoid a Class A misdemeanor acquittal. Tex. Penal Code Ann. § 38.03(c), (d).

### (2) Was the misconduct repeated despite the trial court's admonitions?

Regarding whether the misconduct was repeated after the trial court admonished the State to stop, there is nothing in the record suggesting either the prosecutor or Cavinder repeatedly engaged in any misconduct in defiance of the trial court's admonitions to the contrary. The evidence was just the opposite. Cavinder made one mistake, Cavinder brought the mistake to the prosecutor's attention promptly, and the prosecutor immediately took the matter up with the court.

### (3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

Cavinder gave a reasonable, good faith explanation for the conduct. Cavinder said he left the courtroom before the jury was seated. This suggested he left after knowing the jury's composition. Inasmuch as Cavinder appears to have helped with the jury selection, it makes sense he would wait to learn who was on the jury before leaving. When Cavinder made this statement, no one balked at this assertion. The trial judge did not ask follow-up questions suggesting his recollection was different. Similarly, defense counsel, who was presumably present whenever Cavinder left the courtroom, declined to cross-examine Cavinder. About fifty days later, appellant's wife testified that her recollection was that Cavinder did not leave until the jurors themselves left. The trial court could have discounted her recollection. It could have questioned how closely she focused her attention on Cavinder during voir dire, and it could have concluded that although she could honestly say she thought Cavinder left along with the jurors, her recollection was mistaken.

Cavinder also said he mistook Juror Number Three for Veniremember Fifteen. Once again, no one balked or asserted such a mistake was preposterous. Just the opposite, the trial judge said, "I completely

believe that he believed he was speaking to [Veniremember Fifteen]." Additionally, we note the trial judge excused the jury around three o'clock in the afternoon. Cavinder could have assumed the case would have proceeded directly to opening statements and the initial witnesses and, therefore, could have assumed anyone in the hall when he returned would not have been a juror and, under the circumstances, most likely would have been one of the excused veniremembers. Additionally, Juror Number Three did not attach her jury badge prominently near her collar but, instead, attached it to her purse, which, in accord with Cavinder's testimony, was apparently hanging at her side. Cavinder may have anticipated the juror badge being more prominently displayed near the collar and, not seeing one, assumed the woman to whom he was talking was not a juror. Finally, Juror Number Three was apparently convinced that Cavinder was not initially aware she was a selected juror. Whatever the explanation, the trial judge stated on the record he thought it was an honest mistake, and the record supports such a finding.

### (4) Was the conduct "clearly erroneous"?

### (5) Was there a legally or factually plausible basis for the conduct despite its impropriety?

### (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional?

Cavinder's conduct was admittedly improper, but there was, as explained above, a factually plausible basis for his conduct. Both Cavinder and Juror Number Three agreed Cavinder was mistaken about her status as a juror. Once alerted to the misconduct, the prosecutor promptly brought the matter to the trial court's attention. The trial court could have seen this as some sort of fraud on the court to goad appellant into moving for a mistrial when it was otherwise clear appellant was well on his way to an acquittal, or the trial court could have seen this as Cavinder making an honest mistake, Cavinder recognizing the gravity of the mistake, Cavinder promptly bringing the mistake to the prosecutor's attention, and the prosecutor responsibly bringing the matter to the court's attention to address on the merits, thereby ensuring appellant had a fair trial. The former construction is problematic even on a cold record. The trial court's ruling is consistent with the latter construction, and the latter construction is supported by the record.

Reviewing the evidence in the light most favorable to the trial court's ruling, we find no abuse of discretion. *See Bennett*, 245 S.W.3d at 618, 620. We affirm the denial of appellant's application.

DAUPHINOT, J., filed a dissenting opinion.

### LEE ANN DAUPHINOT JUSTICE, dissenting

I must respectfully dissent from the majority opinion because I believe appellate courts are obligated to admit that the emperor is wearing no clothes, no matter how popular the emperor might be.

Unlike trial judges, who primarily see only the conduct in the courtrooms over which they preside, appellate courts are presented with records from other courts in that county as well as other courts in other counties within that appellate district. Appellate judges are in a better position than trial judges to see patterns of conduct. Consequently, appellate judges have an obligation to speak up when observed patterns show a course of conduct

at odds with constitutional mandates and fundamental fairness.

The trial court granted Appellant Byrias Roberson's motion for mistrial as a result of a conversation between the prosecutor's investigator and a member of the jury after jeopardy had attached. After a second prosecution began, Appellant filed his application for writ of habeas corpus in the trial court, alleging that denial of habeas corpus relief would result in double jeopardy. In his prayer, Appellant asked the trial court to grant his application, issue the writ, conduct a hearing on the merits prior to trial, grant relief discharging him from restraint, and dismiss the prosecution.

The trial court set the matter for hearing on its merits, issued a ruling denying relief after the hearing, and certified Appellant's right to appeal.

The majority holds that the record supports the trial court's conclusion that Investigator Donnie Cavinder made an honest mistake. Respectfully, although the Texas Court of Criminal Appeals has abandoned *Bauder*[1] and returned to a standard requiring proof that the prosecution intended to cause a mistrial,[2] when the record shows such a total disregard for rules of trial and pretrial conduct that mistrial is mandated, it is difficult to understand how an objective observer can conclude that such conduct can be called "just an honest mistake." At some point, appellate courts must hold that the conduct is so egregious that the party cannot avoid its consequences.

Appellant made appropriate pretrial requests to discover prior acts of misconduct that the State intended to use. No such discovery was provided by the State.

Then Appellant filed motions in limine regarding extraneous acts of misconduct. The trial court heard the motions the day voir dire began. The prosecutor admitted that she anticipated

testimony in this case regarding the officer's entry into the home. If defense counsel intends to challenge the legality of that entry, I would like the opportunity to question some of the State's witnesses regarding a prior encounter between the defendant and these witnesses about and regarding a disturbance call. He had barricaded himself and his family inside his home. The SWAT team was called to get him out of the home. Two of the members of the SWAT team are witnesses in this case. This prior incident between the defendant and these officers is important for several reasons. It goes to their familiarity with the defendant, their ability to identify him on the date of the offense. It's part of how they recognized him on the date of the offense. It also goes to their state of mind on the date of the offense, goes to why gang task force officers were asked to serve these warrants on the defendant, and also goes to their reason to believe that the defendant lived in this particular residence.

When the trial court asked for his response, defense counsel replied, "Well, Your Honor, we've asked or requested notice of any bad acts or convictions, and we haven't received any of those." The record reflects that Appellant had requested that notice at least as early as September 2012. His motion in limine was heard August 21, 2013. The trial judge responded,

1. *Ex parte Bauder*, 974 S.W.2d 729 (Tex.Crim. App.1998), *overruled by Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex.Crim.App.2007).

2. *Francis v. State*, 428 S.W.3d 850, 855 (Tex. Crim.App.2014).

Well, let's do it this way. I'll go ahead and sustain or grant on this limine that y'all will approach, and then we would get into exactly what the officers could or could not go into. Without hearing them, I'd be inclined to say they might have had previous contact or something like that that's how they recognized. But to go any further might be a problem. But we'll discuss that. So I'll go ahead and grant that limine on that ground. Make sure you come up before you start with them.

The lawyers selected the jury, and the jury was seated and sworn and heard Appellant plead not guilty before the trial judge adjourned the proceedings and released the jury.

Cavinder was present in the courtroom during voir dire but claimed that he left the courtroom before the jury was seated. The record reflects that the trial judge gave the following instruction to the venire during the time Cavinder said he was in the courtroom:

> To avoid looking like you are friendly with one side of the case, do not mingle or talk with the lawyers, the witnesses, the parties, or any other person who might be connected with or interested in the case. Do not remain within the hearing of anyone who might be discussing the case. These persons have to follow these same instructions as you....

Cavinder was introduced to the venire as the investigator for the prosecution.

Both the State and the defense agree that Cavinder went personally to the judge, along with the prosecutors, to inform the judge that he had spoken with a juror, Eileen Vale. Both Cavinder and Vale testified about their encounter. Both agreed that Cavinder had approached Vale in the hallway outside the courtroom. That is, it was an intentional encounter on Cavinder's part, and it was not caused by anyone else's actions. Cavinder testified that he believed that Vale was a member of the venire who had been released from jury service, a Ms. Steele.

The record, however, clearly shows that Steele was not released from jury service until Vale was sworn as a juror. Steele was not excused for cause or for any other reason. She was released only because she was not chosen as a juror. It was only the seating of the jury that showed Steele's release. Cavinder could not have known Steele was released without also knowing that Vale had been seated as a juror. Indeed, when each side had submitted its strikes, the trial judge seated each juror by name. When he reached Vale, he called her name and then asked if he had pronounced it correctly. That is, Vale was singled out by name. Then the trial judge said,

> If each member of the jury will please stand and raise their right hand for me.
>
> (The jury was sworn)
>
> All right. Thank you. Be seated, please. All right. That's our lucky six. For everybody else who's here on the panel, I spoke with the district clerk, and me releasing you here today here in just a couple minutes will end your service for the week....
>
> ....
>
> (Remaining jury panel exits courtroom)

Vale informed Cavinder that he was mistaken about her identity, and he appeared to recognize his error. According to both Vale and Cavinder, they continued to speak, even after he realized that she was not Steele. That is, Cavinder continued his conversation with juror Vale after realizing and admitting that she was not the venire member who had been excused. They agreed that he spoke with her about

her game warden experience. Vale, however, disagreed with Cavinder's representation that he did not discuss the case at bar. Specifically, Vale testified,

> JUROR VALE: From what I remember, he—he kind of made a comment about—I'm trying to—because I was heading down the stairs and he was telling me and then saying about—I'm trying to remember. Let me just—I just said it was okay, but we stopped the conversation right there because he didn't realize that at point I was a juror, a selected juror, I guess.
>
> THE COURT: You don't remember? We just have to be very specific.
>
> JUROR VALE: I know.
>
> THE COURT: Because it pertains to this case.
>
> JUROR VALE: Right.
>
> THE COURT: *You're sure his question or comment pertained to this particular case?*
>
> JUROR VALE: He just said—uh, I think he said, *"You were struck, but t hen we got you on" or something, or something to that effect,* which I think—which I think—it didn't—I mean, to me, it didn't—I kinda said, okay, whatever. I'm going to leave right now. [Emphasis added.]

Clearly, Vale believed that Cavinder was talking about the case at bar when he said that she had been struck but "we" managed to get her "back on." It is difficult to understand how Vale could have believed anything else. And it is difficult to understand why Cavinder would have told a venire member who had been excused that she had been struck but "we" managed to get her "back on."

---

3. *Ex parte Adams,* 768 S.W.2d 281, 291–92 (Tex.Crim.App.1989) (holding that "as a part

The conscientious trial judge, who can only be commended for his handling of this situation, was concerned about the appearance of impropriety:

> What I'm dealing with now is something that would—whether there was any— and I'm not saying there was any intention on it; I'm not saying who said what. However, what remains is the appearance. And the appearance that there was in her, at least in her mind, from her testimony—I mean that's—[DEFENSE COUNSEL] stated correctly. That's exactly what I heard.
>
> And I want both sides to have a fair trial. And with *that appearance that there was some influence with regard to that juror, I am left with no option except granting a mistrial. There is no way it can be remedied.* And I—I know y'all have—we have been through a rough day yesterday. And I apologize that that work is for naught. And I'm not casting fault on Investigator Cavinder at all. I understand that was an honest mistake. I completely believe that he believed he was speaking to Ms. Steele.
>
> However, it's that appearance that we just cannot get by in this matter. So for that reason, I'm going to grant a mistrial. Now, we'll talk later whether double jeopardy has attached. I don't think it has.... [Emphasis added.]

He had no alternative but to grant a mistrial. The positive result of the mistrial for the State was that its notice of intent to use extraneous acts of misconduct against Appellant became timely and those extraneous acts became admissible.

The rule is well established that the knowledge of one part of the prosecution team is imputed to all members of the prosecution team.[3]

---

of the investigating team [the Dallas police officer's] knowledge of [the witness's] lack of

267

The prosecutors were aware that the venire member with whom Cavinder improperly spoke had been sworn as a juror. The record casts doubt on Cavinder's testimony concerning his own knowledge. The trial judge singled Vale out when swearing in the jury, asking if he had pronounced her name correctly. Further, the record shows that Vale was chosen and sworn as a juror before Steele was released with the other members of the venire who were not chosen for the jury. It is therefore difficult to understand how Cavinder could have known that Steele was not chosen as a juror but did not know that Vale was selected as a juror.

The Vale's testimony concerning the improper conversation with Cavinder also indicated his awareness that she had been chosen as a juror. Specifically, she stated that he had told her that she had been struck but had also told her, "[T]hen we got you on." Even Cavinder admitted that he continued to speak with her after he realized that she was not the venire member who had been released from jury service. If we give total deference to the determinations of the trial judge, we must conclude that when Cavinder first approached Vale, he believed that she was Steele. If he was aware that Steele had not been chosen for the jury, he had to be aware that Vale was, either as a result of his own observation or as a result of the imputed knowledge of the prosecuting attorneys. By his own admission, he remembered that Vale was the one who had gone to game warden school. Yet he continued to speak with her.

After hearing only Cavinder's admissions, the trial judge did not yet believe that there was reason to declare a mistrial.

After hearing Vale's testimony, however, he concluded that the trial could not continue. Implicitly, the trial judge believed her testimony, including the statement that Cavinder told her that she had been struck, but "we got you on."

Given the record before us, it is impossible to conclude that Cavinder was unaware that Vale had been chosen for the jury at the time they spoke and he realized she was not Steele. This knowledge means that there is no justification for the conversation. The mistrial was caused by an improper communication by a member of the prosecution team with a juror. The trial judge properly granted the mistrial because of the influence of that conversation on a juror. For the same reason, the trial judge should have granted Appellant's requested habeas relief.

The prosecution did not provide mandated discovery to the defense. The trial judge ruled that the notice of extraneous acts of misconduct that the State intended to offer into evidence was untimely and that the evidence, presumably, were inadmissible. Perhaps the decision to withhold discovery was a trial tactic. If so, failing to comply with discovery mandated by rule, statute, or court order renders that evidence inadmissible at trial. The Texas Court of Criminal Appeals has held

> Rule 404(b) literally conditions the admissibility of other-crimes evidence on the State's compliance with the notice provision of Rule 404(b) . . . .
>
> Since the notice requirement of Rule 404(b) is a rule of evidence admissibility, then it is error to admit Rule 404(b) evidence when the State has not complied with the notice provision of Rule 404(b).[4]

---

identification at the lineup and his assistance to her" was imputed to the prosecutor); *see also Rubalcado v. State,* 424 S.W.3d 560, 574 (Tex.Crim.App.2014) (imputing knowledge of

one county's law enforcement to the law enforcement of another county).

4. *Hernandez v. State,* 176 S.W.3d 821, 824 (Tex.Crim.App.2005).

When the trial judge suggested that would be his ruling, the State clearly benefitted from the mistrial caused by Cavinder's actions. That is, the time delay between the mistrial and future trial setting erased the notice and admissibility issues.

Case law instructs us that double jeopardy prohibitions bar retrial when the prosecution intends to cause a mistrial.[5] The *Masonheimer* court held that the prosecution's hiding of *Brady* material to avoid an acquittal was sufficiently egregious conduct to bar retrial after the trial court was forced to grant a mistrial because this prosecutorial misconduct was discovered.[6]

Case law does not explain how we are to determine motive when it is an investigator and not prosecutors who commits the misconduct, and misconduct it certainly was. There are only two reasons an experienced investigator would tell a member of the jury that she had been struck but the prosecution had managed to get her back onto the jury: either he was attempting to cause a mistrial or he was attempting to deprive the defendant of a fair trial by an impartial jury. In light of the fact that the State had failed to disclose prior bad acts it fully intended to use at trial, despite Appellant's timely request for disclosure, and in light of the trial court's statement that those bad acts would probably not be admitted before the jury because of the failure to disclose them, it is impossible to say that the mistrial did not benefit the State.

The conscious decision of the State to withhold such mandated discovery is particularly disturbing in light of its similar decisions in *Dabney v. State*,[7] *Pitman v. State*,[8] and *Juarez v. State*.[9]

To hold that retrial is not barred by double jeopardy is to condone and encourage such conduct. We have an obligation to both the bench and the bar to hold, as the trial court did when granting the mistrial, that ignoring court-ordered or statutorily- or rule-mandated discovery is not acceptable trial strategy. I would therefore reverse the order of the trial court denying habeas relief and remand this cause to the trial court with instructions to grant Appellant's requested habeas relief and enter an order of dismissal. Because the majority does not, I respectfully dissent.

---

**5.** *Ex parte Masonheimer*, 220 S.W.3d 494, 509 n. 21 (Tex.Crim.App.2007).

**6.** *Id.* at 507–08.

**7.** No. 02–12–00530–CR, 2014 WL 5307178, at *7–9 (Tex.App.—Fort Worth Oct. 16, 2014, pet. filed) (mem. op., not designated for publication).

**8.** 372 S.W.3d 261, 268–70 (Tex.App.—Fort Worth 2012, pet. ref'd).

**9.** No. 02–08–00167–CR, 2009 WL 1564926, at *1 & n. 2 (Tex.App.—Fort Worth June 4, 2009, no pet.) (mem. op., not designated for publication).